817 A.2d 264

Barbara FORD

v.

DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONAL SERVICES.

No. 948, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Feb. 26, 2003.

490

Robin R. Cockey (Cockey, Brennan & Maloney, P.C. on the brief), Salisbury, for appellant.

Scott S. Oakley, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued Before JAMES R. EYLER, ADKINS, WILLIAM W. WENNER, (Ret., specially assigned), JJ.

WENNER, J.

Appellant, Barbara Ford, was employed as a correctional officer by the Department of Public Safety and Correctional Services ("the Department"). On 14 April 1999, the Department filed a Notice of Termination against appellant, charging her with having violated various standards of conduct applicable to correctional officers, and she appealed to the Office of Administrative Hearings ("OAH").

On 5 May 1999, appellant filed a complaint pursuant to Md. State Pers. & Pens.Code Ann. § 5–305 (hereinafter referred to as the Whistleblower Statute) concerning her termination from the Department. The Department denied the complaint, and appellant appealed that decision to the OAH.

The appeals were consolidated, and Administrative Law Judge (ALJ) Leah J. Seaton heard the matter over the course of several days in November and December 1999. The ALJ dismissed the complaint, concluding that appellant's termination did not constitute a reprisal under the Whistleblower Statute. With respect to the appeal from the Notice of Termination, ALJ Seaton concluded that the Department had failed to comply with the requirements of State Pers. & Pens. Article § 11–106, reversed appellant's termination, and reinstated her with back pay.

Appellant appealed the dismissal of her whistleblower complaint and the Department appealed the reversal of appellant's termination. The Circuit Court for Somerset County affirmed the dismissal of appellant's whistleblower complaint but reversed and remanded ALJ Seaton's decision with respect to appellant's termination. This appeal followed.

## ISSUES PRESENTED

On appeal, appellant presents us with several issues for our consideration, which we have rephrased as follows:

I.  Whether the appointing authority [1] properly investigated the alleged misconduct before imposing discipline;

II.  Whether the appointing authority erred in imposing discipline more than 30 days after the investigation was complete;

III.  Whether the appointing authority failed to consider properly certain mitigating circumstances before imposing discipline;

IV.  Whether the Whistleblower Statute applies to an employee's complaint about the behavior of a supervisor;

V.  Whether Mr. Kaloroumakis is immunized from the retaliatory animus attributable to the appointing authority; and,

VI.  Whether the circuit court erred in ordering a remand because the appointing authority failed to identify any rule or regulation violated by appellant.

## FACTUAL BACKGROUND

The central facts underlying this appeal are undisputed. Appellant began working as a Correctional Officer I at the Eastern Correctional Institute (ECI) in August 1987. Shortly after becoming employed there, appellant met Ralph Logan, a co-worker at ECI. In 1988, appellant and Logan became involved in an intimate relationship, during the course of which Logan, on numerous occasions, successfully pressured appellant into loaning him money, or providing him with various other financial favors. In or about 1990, Logan became ECI's Chief of Security. When appellant attempted to end their relationship, Logan said that "things will change" and that "life will not be good." Even after their relationship

---

1.  "Appointing authority" means an individual or a unit of government that has the power to make appointments and terminate employment. Md.Code Ann., State Pers. and Pens. § 1–101(b).

ended in 1991, Logan continued to pressure appellant for money and to resume their relationship.

Logan received a number of promotions, first serving as Assistant Warden, then Acting Warden. In 1998, Logan became Warden. In the meantime, appellant had unsuccessfully sought numerous promotions, including one on which she had the highest score on a test for the position. In July 1996, appellant filed a grievance because she had not been promoted, but, according to her, she withdrew the grievance when Logan advised her not to pursue it. In addition, appellant filed a complaint with the Commission on Human Resources against Logan but did not pursue it because she feared Logan would retaliate.

In about 1991, appellant began a romantic relationship with Joann Diggs, another co-worker at ECI. They lived together from 1991 until their relationship ended in approximately June 1998. During this period, Diggs witnessed telephone calls from Logan to appellant. On one occasion, Diggs confronted Logan over the telephone, warning him that such calls constituted sexual harassment. As a result of her warning, Logan threatened Diggs.

In about June 1998, Diggs was assaulted by Anna Allen, another correctional officer. Diggs charged Allen with criminal assault, and Allen responded with allegations that Diggs had been sexually harassing her. As a result of this incident and Allen's allegations, Diggs was demoted. Diggs appealed that action, believing that she had been demoted in retaliation for her having earlier warned Logan that his pursuit of appellant constituted sexual harassment. A hearing on Diggs' appeal was scheduled for 16 March 1999.

After the June 1998 altercation between Diggs and Allen, Logan contacted appellant, requesting information about the altercation. During that conversation, Logan mentioned that promotions were pending, and appellant received a promotion in September 1998. One month later, appellant filed a written complaint charging Logan with discrimination and sexual harassment. On 4 March, 1999, appellant filed a complaint

with the Division of Corrections, repeating the allegations of discrimination and sexual harassment and complaining that ECI had not properly investigated her complaint. The 4 March 1999 letter was actually written by Diggs but had been signed by both Diggs and appellant.

Appellant was scheduled to appear as Diggs' witness at the 16 March 1999 appeal hearing. On approximately three occasions, appellant had been interviewed by Dale McCloud, who was the Department's representative for the Diggs' hearing. It is undisputed that, during the course of those interviews, appellant told McCloud that she had not had any contact with Diggs from January through March 1999. It is also undisputed, however, that appellant had met with Diggs in order to co-sign the 4 March 1999 letter charging Logan with sexual harassment and discrimination. When McCloud received a copy of the 4 March 1999 letter, the signatures of both appellant and Diggs on the letter revealed that appellant had lied to McCloud in telling him that she had not had any recent contact with Diggs.

As the circuit court noted in its written opinion, a separate chain of events commenced in January 1999 when Sgt. Edmund O'Leary, an investigator with the Internal Investigations Unit of the Division of Corrections, was contacted by one Thomas Eichelberger, an inmate at ECI. During a meeting, Eichelberger informed O'Leary that appellant hated Allen because of her role in breaking up her relationship with Diggs. According to Eichelberger, appellant wanted to retaliate by planting a nude photograph of Allen in an inmate's cell. She also proposed giving Eichelberger Allen's bank account number so that an inmate could deposit money into the account. Although O'Leary and Eichelberger met on three occasions, Eichelberger was unable to provide O'Leary with any corroborating evidence to support his claims. Consequently, O'Leary did not further pursue the matter.

The two chains of events converged in March 1999 when O'Leary was assisting McCloud in serving subpoenas for the Diggs appeal that was scheduled to be heard on 15 March

1999. Prior to his role in serving the subpoenas, O'Leary had never met McCloud. On the day before the scheduled hearing, McCloud conducted a third interview with appellant. Prior to the commencement of the interview, McCloud became aware of Eichelberger's allegations and taped the last portion of his interview with appellant and arranged for O'Leary to be present.

When confronted with the 4 March 1999 letter she had co-signed with Diggs, appellant admitted that she lied to McCloud when she previously denied having had any recent contact with Diggs. She also admitted having participated in conversations with Eichelberger about planting a photograph of Allen and making a deposit into Allen's bank account. Appellant claimed, however, that Eichelberger had initiated the contact and that she had no intention of providing Eichelberger with the nude photograph or providing him with the bank account number, but she admitted not having reported her conversations with Eichelberger to her supervisor.

At the conclusion of the third interview, McCloud informed appellant that he would recommend her termination from employment because of her admitted lying about contacts with Diggs and her failure to report her conversations with Eichelberger to her supervisor.

On 16 March 1999, Logan met with appellant, told her that she could avoid being terminated by accepting a demotion, and appellant declined to do so.

Due to his past romantic involvement with appellant, Logan concluded that it would be necessary for him to designate someone else to deal with appellant's personnel matter. At some time between 16 and 19 March 1999, Logan informed Assistant Warden Kaloroumakis that appellant had admitted to conspiring with an inmate to set up another officer, and on 18 March 1999 designated Kaloroumakis to handle all appointing authority matters on 19 March 1999. Neither Logan nor any other official of the Department instructed Kaloroumakis to recommend that appellant be terminated.

The necessary paperwork for appellant's termination was prepared by ECI's personnel office before it was seen by Kaloroumakis. The notice of termination identified the factual causes for termination: that appellant had engaged in a series of conversations with an inmate concerning a plan that would likely result in the termination of another officer, and that appellant had done nothing to dissuade or discipline the inmate nor to inform her supervisor of the matter. It also noted that appellant had said that she had never intended to pursue the matter. Moreover, the notice of termination also indicated that appellant had admitted lying to McCloud during the course of his investigation of another personnel matter.

Prior to his 19 March 1999 meeting with appellant, Kaloroumakis became aware of the contents of O'Leary's two-page report, which summarized his investigation with respect to appellant's contacts with Eichelberger. O'Leary's report indicated that it had been prepared for Logan as an Internal Investigation Unit case.

Kaloroumakis met with ECI's personnel officer on 19 March 1999; then both met with appellant. Kaloroumakis read the charges to appellant and told her that he intended to recommend that she be terminated. He neither asked appellant if the allegations were true, nor if she had any mitigating information. When the personnel officer left the room to make photocopies of documents for appellant, appellant said she believed she was being harassed and that Eichelberger had entrapped her. Not only did Kaloroumakis not ask appellant for any details, he did not investigate her allegations.

We shall include additional facts as necessary in our discussion of the issues presented.

## STANDARD OF REVIEW

Our standard of review in the instant case was declared by the Court of Appeals in *Curry v. Dep't of Public Safety and Correctional Servs.*, 102 Md.App. 620, 651 A.2d 390, *cert. dismissed*, 340 Md. 175, 665 A.2d 1038 (1995), as follows:

We review an administrative agency's decision under the same standard as the circuit court. In each case, the court must determine whether the agency's decision is "in accordance with the law or whether it is arbitrary, illegal, and capricious." The court will not overturn the agency's factual findings or its application of law to facts if the decision is supported by substantial evidence considered in light of the record taken as a whole. When reviewing issues of law, on the other hand, the court's review is expansive and it may substitute its judgment for that of the agency. Our role is to be certain that the circuit court did not err in its review.

*Curry*, 102 Md.App. at 627–28, 651 A.2d 390 (citations omitted).

## DISCUSSION

### I.

Appellant first contends that, as the appointing authority in this case, Kaloroumakis failed to comply with § 11–106 of the State Personnel and Pensions Article [2] in failing to investigate appellant's alleged misconduct prior to imposing discipline; relied uncritically upon misinformation supplied by others; drew false conclusions from that misinformation; and decided to impose discipline based upon his misconception of the case. Section 11–106 provides, in relevant part:

(a) *Procedure.*—Before taking any disciplinary action related to employee misconduct, and appointing authority shall:

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

---

2. All statutory references herein are to the State Personnel and Pensions Article unless otherwise indicated.

(b) *Time limit.*—Except as provided in subsection (c) of this section, an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.

In deciding to reinstate appellant with pay, ALJ Seaton concluded that introducing Kaloroumakis into the termination procedure at the last minute violated the procedural protections provided employees by § 11–106. She concluded that, although the Warden has authority pursuant to COMAR 17.04.01.04A(5) to designate another individual to handle the duties set forth in § 11–106, Kaloroumakis was presented with a *fait accompli.* According to the ALJ, Kaloroumakis was told that appellant had confessed to being involved in the conspiracy to set up Allen, had received "conclusions" from O'Leary and McCloud, and was informed that he would be handling a "termination conference." In the ALJ's opinion, Kaloroumakis' failure personally to conduct even a rudimentary investigation of the charges against appellant deprived appellant of the protections afforded by § 11–106.

The trial court concluded that the ALJ's decision was based on an error of law and concluded that § 11–106 did not prohibit Kaloroumakis from taking personnel action based on O'Leary's investigation and report and his personal conversations with Logan and the personnel officer. We believe the trial court also correctly noted that appellant had not disputed the fundamental accuracy of Kaloroumakis' findings leading to his recommendation that appellant be terminated. Appellant acknowledged having lied in telling McCloud that she had not had recent contact with Diggs, and she had not disputed having spoken with Eichelberger about certain actions that would likely have been detrimental to Allen and had failed to report those conversations to her supervisor. Moreover, Kaloroumakis' termination letter expressly acknowledged appellant's assertion that she had not intended to pursue the plan discussed by Eichelberger.

■ It is quite clear from reading § 11–106 that there is no requirement that the appointing authority personally conduct an investigation of alleged misconduct. Thus, the trial court did not err in concluding that "[t]he appointing authority is not required to personally conduct an investigating interview or even review recordings or transcripts of them" and he is "entitled to have others gather relevant information for him."

## II.

Appellant next contends that the appointing authority failed to impose disciplinary action within the 30 day time limit set forth in § 11–106. She claims that because O'Leary had known of her alleged misconduct in January and February 1999, his knowledge must be imputed to Logan under principles of agency. We do not agree.

■ Here, there is nothing in the record suggesting that O'Leary was acting as the appointing authority's agent. As an investigator with the Internal Investigative Unit of the Department of Public Safety and Correctional Services, O'Leary did not answer to the warden of ECI and had no duty to report his knowledge to the warden. Since O'Leary had no duty to report Eichelberger's allegations to the appointing authority, O'Leary's knowledge cannot be imputed to Logan under principles of agency. *Boring v. Jungers*, 222 Md. 458, 463–64, 160 A.2d 780 (1960).

■ Indeed, it is noteworthy that O'Leary concluded that he did not intend to terminate appellant based upon Eichelberger's allegations because there was no corroborating evidence. In fact, corroborating evidence was supplied on 15 March 1999, when appellant admitted having engaged in conversations with Eichelberger and had not reported them to her supervisor. Hence, pursuant to § 11–106(b), Kaloroumak-is had imposed disciplinary action within the 30–day time period.

## III.

Appellant also contends that Kaloroumakis refused to consider mitigating circumstances in imposing discipline. At the 19 March 1999 meeting, appellant told Kaloroumakis that she believed she was being retaliated against, was being harassed, and had been entrapped. That Kaloroumakis did not investigate the charges against appellant or her assertions to the contrary are undisputed.

In her written opinion, the ALJ determined that Kaloroumakis had failed to consider any mitigating factors, and referred to his testimony that there could not possibly be any such factors, even had appellant engaged in the conversations with Eichelberger without actually intending to follow through on the plans discussed.

The trial court rejected the ALJ's conclusion that Kaloroumakis had failed to consider any mitigating factors and ruled, as a matter of law, that appellant's bald conclusory assertions made at the 19 March 1999 meeting did not constitute mitigating circumstances under the facts of this case. We agree with the trial court's conclusion. Moreover, the trial court properly noted that appellant's claim of entrapment had no relevance to her culpability for failing to report her conversations with Eichelberger to her supervisors. In addition, the trial court correctly recognized that appellant's claims of harassment, discrimination, and retaliation by Logan are irrelevant as mitigating circumstances in light of the facts of this case. There were absolutely no facts to show that Kaloroumakis, whom the ALJ found was making an independent decision on appellant's employment, was motivated by harassment, discrimination, or retaliation. Moreover, there are no facts to suggest that appellant's contacts with Eichelberger were in any way related to the alleged harassment, discrimination, or retaliation.

The facts before the ALJ and the trial court show that Kaloroumakis had been provided, through the summary of O'Leary's investigation, information that included appellant's claim of entrapment, and her claim to have been approached

by Eichelberger, and that she had never intended to carry through on Eichelberger's scheme. In sum, it was Kaloroumakis' conclusion from the evidence before him, that termination was warranted. Again, we agree.

## IV.

■ Appellant claims to have been terminated from employment in retaliation for filing charges against Logan in violation of Maryland's Whistleblower Statute, Md.Code Ann., State Pers. & Pens. § 5–301 et seq. ALJ Seaton concluded that appellant's termination was not retaliatory and did not violate the Whistleblower Statute. The trial court found that the decision of the ALJ was supported by competent, material, and substantial evidence in light of the entire record, and we agree.

Section 5–305 provides as follows:

Subject to the limitations of § 5–306 of this subtitle, a supervisor, appointing authority, or the head of a principal unit may not take or refuse to take any personnel action as a reprisal against an employee who:

(1) discloses information that the employee reasonably believes evidences:

(i) an abuse of authority, gross mismanagement, or gross waste of money;

(ii) a substantial and specific danger to public health or safety; or

(iii) a violation of law; or

(2) following a disclosure under item (1) of this section seeks a remedy provided under this subtitle or any other law or policy governing the employee's unit.

Maryland's Whistleblower Statute was patterned after the federal Whistleblower Protection Act, 5 U.S.C. 2302. Since the purpose and language of the federal statute are substantially the same as Maryland's statute, we look to interpretations of the federal Whistleblower Protection Act for guidance in interpreting Maryland's statute. See *Faulk v. State's At-*

*torney for Harford Co.,* 299 Md. 493, 506, 474 A.2d 880 (1984)(where the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are ordinarily persuasive).

Federal case law makes clear that, under the federal Whistleblower Protection Act, an employee's complaint about a supervisor's behavior is not a protected disclosure. *Ellison v. Merit Systems Protection Board,* 7 F.3d 1031, 1035 (Fed.Cir. 1993); *Spruill v. Merit Systems Protection Board,* 978 F.2d 679, 692 (Fed.Cir.1992).

As appellant sees it, federal authorities have been loathe to permit federal employees who were retaliated against for filing grievances to proceed with a federal whistleblower complaint because there is a separate statutory remedy under federal law addressing such retaliation. Appellant asserts that because there is no corresponding Maryland statute addressing such retaliation, her only remedy is under Maryland's Whistleblower Statute.

As the Department sees it, however, this ignores the fact that Maryland law provides remedies for specifically addressing employee complaints alleging violations of employment rights and reprisals for making such complaints. *See, e.g.,* Md.Code Ann. State Pers. & Pens. § 12–103 (providing exclusive remedy by which employee may pursue claim of reprisal); Md. Ann.Code art. 49B, § 16(f)(prohibiting discrimination of employee for making charge of discrimination to Maryland Human Relations Commission or testifying, assisting, or participating in a proceeding of the commission).

In light of the above, ALJ Seaton correctly determined that the Whistleblower Statute was not here applicable, and the trial court acted properly in affirming that decision.

## V.

▌ Both the ALJ and the trial court determined that even had appellant's complaints about Logan amounted to "whistleblowing" under Maryland's Whistleblowing Statute, her complaint would fail because she could not prove that she suffered

a reprisal for making her complaints against Logan. According to appellant, Kaloroumakis was manipulated by Logan, whose purpose was retaliation.

The facts before us simply do not support appellant's contentions. It is undisputed that no one in the Department, including Logan, had instructed Kaloroumakis to recommend that appellant be terminated. In addition, Kaloroumakis was unaware of appellant's complaints when he recommended that she be terminated.

Moreover, § 5–302(b) provides that "[t]his subtitle does not prohibit a personnel action that would have been taken regardless of a disclosure of information." This provision's plain language clearly negates appellant's assertion that a presumption of discrimination arises merely from the temporal proximity of her complaints against Logan and her termination by Kaloroumakis.

## VI.

Appellant finally contends that there is no need for this case to be remanded to the OAH for a determination of whether she committed terminable misconduct because there is no rule or regulation that would have required her to report Eichelberger's statements. This contention is not supported by the evidence. The Notice of Termination explicitly identified several standards of conduct, code provisions, and COMAR provisions that appellant had violated. The ALJ referred to the parties' mutual understanding of the source and content of the standards of conduct identified in the Notice of Termination. In a footnote to her written opinion, ALJ Seaton noted that, "[a]lthough the Notice of Termination does not specify that the alleged violations are from # 50–2 of the Directives, this is the [Division of Corrections Directive] which sets forth conduct standards for correctional officers and, on the record, all parties clearly understood that the Notice was referencing # 50–2." In addition, the specific violations of standards of conduct were detailed in O'Leary's final report and in the

"Unsatisfactory Report of Service" that was served on appellant.

Furthermore, appellant's claim that she had been terminated solely because of her conversations with Eichelberger is factually incorrect because it ignores the undisputed fact that appellant had lied to McCloud.

It was determined by the trial court that, notwithstanding the facts of this case, and the heavy burden placed on an employee in establishing that the facts do not warrant termination, appellant must be afforded an opportunity to establish whether she is entitled to relief on the ground that the facts of her case did not warrant her termination.

**JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**